D. S. IRONS ET AL. *v*. THOMAS J. PRICE, Appellant, and EMPORIA NATIONAL BANK, Respondent.

June 19, 1883.

INTERPLEA — EQUITY — TRIPARTITE CONTRACT — ESTOPPEL — WAIVER. — An oral tripartite contract was entered into by A, a cattle dealer at Emporia, Kansas, B, a banking corporation at the same place, and C, a cattle broker at St. Louis, to the following effect: A was to make purchases of cattle and draw on C for the purchase-money and expenses; B was to advance cash on the draft, and forward it for collection, the cattle purchased being at the same time shipped to C, and a memorandum was to accompany each draft, showing that it was drawn against the shipment. Under this agreement, a purchase was made of two hundred and five head of cattle; the money was advanced by B, and the cattle were duly shipped by A; but, before they reached St. Louis, C failed, and the draft was dishonored. By arrangement, the cattle were received and sold by D, the plaintiff, for account of whom it might concern. A and B interpleaded for the proceeds, and B. recovered. *Held*, that the recovery was proper. A could not set up any technical rights as shipper or owner in the face of the agreement; his claim, as asserted, not being that of a general creditor, it was immaterial that B had not perfected a lien on the property. An estoppel arose in favor of B, because of the agreement and the money advanced; and it was, further, immaterial that C was largely indebted to A on general account, outside of this transaction.

APPEAL from the St. Louis Circuit Court, HORNER, J. *Affirmed*.

SCOTT & LYNN and E. J. O'BRIEN, for the appellant; BROADHEAD & HAUESSLER, of counsel: If Hamer, Stewart

& Burnside had any claim for the money advanced on the cattle in question and assigned it either in law or equity, such assignment is only an assignment of a chose of action and therefore the bank took just what rights the assignors, Hamer, Stewart & Burnside had in the matter, subject to all legal and equitable set-offs, Phelps & Price, or either of them might have against the assignors. Price had a claim of $13,000, Phelps had a claim of $2,000, and Phelps & Price had a claim jointly of $2,000. The defendant bank, at most, only stands in the shoes of Hamer, Stewart & Burnside, therefore our claims against Hamer, Stewart & Burnside, being more than the amount in controversy is a good legal and equitable set-off against it.— 2 Rev. Stats. 1879, p. 659, sects. 3867, 3868, 3871, ch. 64 ; *Kent* v. *Rogers*, 24 Mo. 233 ; *Weiss* v. *Wahl*, 5 Mo. App. 408 ; Waterman on Set-off and Counter-claim, sects. 103, 104, pp. 118–121 and cases there cited.

The draft in question is drawn generally and does not purport to be drawn on any particular fund whatever. In order to create an equitable assignment it is absolutely necessary that it should be drawn specifically on the fund equitably assigned. — *Watson* v. *Wellington*, 1 Russ. & Myl. 602 ; *Phillips* v. *Stagg*, 2 Edw. Ch. 108 ; *Luff* v. *Pope*, 5 Hill (N. Y.), 413 ; *Coperthwaite* v. *Sheffield*, 3 N. Y. 243 ; *Winter* v. *Drury*, 5 N. Y. 525 ; *Hopkins* v. *Beebe*, 26 Pa. St. 85 ; *Greenfield's Estate*, 24 Pa. St. 232, 240 ; *Clemenson* v. *Davidson*, 5 Binn. 398 ; *M. & F. Bank*, v. *Jauncy*, 3 Sandf. (N. Y.) 257 ; *Jones* v. *P. W. L. & T. Co.*, 13 Nev. 359 ; *Bank* v. *Bogy*, 44 Mo. 13 ; *Wheeler* v. *Stone*, 4 Gill, 38. The indorsement on the back of this promissory note is no part of the instrument itself, but is a simple memorandum made by Stewart for his own benefit, as he says, to inform his partners that cattle had been shipped. — *Roby* v. *Ollier*, L. R. 7 Ch. App. 695 ; *Brenner* v. *Johnson*, L. R. 5 H. L. Cas. 157.

NOBLE & ORRICK and C. N. STERRY, for the respondent: "A promise to pay out of a particular fund when received will be specifically enforced in equity, and thus operate as an assignment, especially when the circumstances are such that the promise was given as security for money loaned, and was relied upon as such by the lender." — *Spain* v. *Hamilton*, 1 Wall. 604; 3 Dill. 287; *Hart* v. *Railroad Co.*, 13 Metc. 99–108; *Walker* v. *Mauro*, 18 Mo. 564; *Taylor* v. *Lynch*, 5 Gray, 49. "When a factor advances money to his principal upon goods shipped his principal to him to be sold on commission, the factor becomes a special owner of the property to the extent of the money advanced." — *Valle* v. *Cerre*, 36 Mo. 577; Story on Ag., sect. 111; *Halliday* v. *Hamilton*, 11 Wall. 560; *Gray* v. *Foster*, 67 Mo. 512.

LEWIS, P. J., delivered the opinion of the court.

The plaintiffs obtained an order of the circuit court, directing them to pay into court the sum of $11,811.27, less $500 for expenses, and further directing that the defendants, Phelps & Price, on the one hand, and the Emporia National Bank, on the other, interplead as several and adverse claimants of the fund. The terms of the order were obeyed and issues were joined accordingly. Upon a hearing of the testimony the court sustained the claim of the Emporia National Bank, and so gave judgment. Defendant Price appealed.

Phelps & Price were dealers in cattle at and near Emporia, Kansas. Hamer, Stewart & Burnside, partners, were cattle dealers and brokers near the stock yards in the vicinity of St. Louis. Phelps & Price purchased from one Martindale about two hundred and five head of cattle, and shipped them to Hamer, Stewart & Burnside for sale. This firm failed before the cattle reached St. Louis; and, by an arrangement between Burnside and other parties interested, the cattle were turned over to Irons & Cassiday,

the plaintiffs, to be sold for account of whom it might concern. They sold the stock to one Burke for $15,211.27, and paid over $3,400, part thereof, to Phelps & Price. The residue of this sale money constitutes the fund in controversy. Phelps & Price maintain their claim on the ground that they were owners and consignors of the property for their own benefit, and that they never parted with either ownership or possession until sale was made for them by Irons & Cassiday. If this were the whole case, no equities intervening in favor of other parties, their legal claim would of course be unquestionable. They allege, moreover, that Hamer, Stewart & Burnside were indebted to them on other accounts to an amount exceeding the sum in controversy.

The bank's allegations in support of its claims are in effect as follows: Stewart, of the firm of Hamer, Stewart & Burnside, was at Emporia, Kansas, representing his firm and transacting its business. A tripartite agreement was made orally by and among the two cattle firms or their representatives and the bank, to the following effect: when Phelps & Price should buy a lot of cattle, under the arrangement, Stewart would draw a sight draft upon his firm for the necessary purchase-money, in favor of the Emporia National Bank. The cattle purchased would be shipped to Hamer, Stewart & Burnside for sale. The bank would then honor the check of Stewart, or of Phelps & Price, as might be necessary, to consummate the transaction in favor of the original vendor, for the amount of the draft less certain commissions or fees. The draft would be indorsed with a memorandum of the cattle shipped, and would be transmitted by the bank to its correspondent in East St. Louis, to be there paid by Hamer, Stewart & Burnside out of the proceeds of their sale of the cattle. It was understood that in each instance the draft should be considered as drawn against that particular shipment of cattle. The bank's interplea does not so summarize the features of the agreement. But the details given of a pre-

liminary understanding between Stewart and the bank, with its recognition by Phelps & Price, and their active co-operation in whatever was necessary to carry out its provisions, result in a showing of the common compact whose effective terms were as above stated.

There had been a number of previous transactions in conformity with this compact, and the present one was in accordance therewith, up to the arrival of the cattle at the stock yards in East St. Louis.

If the case thus presented by the bank was substantially verified in the proofs, we know of no principle upon which the judgment should be reversed. Let us suppose that all the parties were present together at every step in the proceedings. Phelps & Price agree with Martindale for the purchase of his cattle. " I," says the bank, " will furnish the purchase-money necessary for this trade, on condition that the cattle be sent to Hamer, Stewart, & Burnside, at East St. Louis, who will there sell the stock and, out of the proceeds, repay to me the money so advanced." All agree to this. The money is paid over, and the cattle are sent on their way — by whom, or in whose name, is not of the least consequence, so far as the rights of any party to the agreement are concerned. The cattle are sold, not by Hamer, Stewart & Burnside, but by another firm of brokers, designated by them, and not objected to by any one. Can it be possible for Phelps & Price then to claim the sale-money without a violation of their contract with the bank? Can they plant themselves upon any technicalities of apparent ownership or possession, to annul the purpose of the contract, without a fraud upon the bank which, in faithful performance on its part, has paid out its money at their instigation and request? Surely not. The questions answer themselves. It is true that in this case, all the parties were not constantly together and acting in unison, as in the case supposed. But if the several acts

done were in pursuance of an agreement upon which all had united, the effect must be precisely the same. Were this not so, agreements would be valueless in law. It can not be said that all the testimony sustains the hypothesis of fact advanced on the part of the bank. There are conflicts on material points. But, we think, after a careful examination, that the evidence strongly preponderates in favor of that hypothesis, and of the conclusion reached by the trial court, as appears by the judgment rendered. Mr. Hood, vice-president and managing officer of the bank testified to the effect, that Phelps was introduced to him by Stewart, and that both Phelps & Price were present at the conversation which ensued. Stewart said that Phelps was there to buy cattle, and that he, Stewart, wished to pay for them, as had been done in former seasons, by draft on Hamer, Stewart & Burnside, against the cattle, which would be shipped to that firm. Hood said that his bank would pay the drafts so drawn, upon the understanding that Stewart's firm would take them up from the proceeds of the cattle, when sold. Phelps & Price offered no objection to the arrangement. Afterwards Price told Hood that he and Phelps were operating together, and was thereupon permitted by Hood to draw a check in payment for cattle purchased from one Tague, upon the strength of the arrangement made by Phelps, Stewart, and Hood, as before recited. The first item in the present transaction was a check drawn by Phelps on the witness' bank, in favor of Martindale, from whom the cattle were purchased. Hood refused to honor this check, until Stewart had first drawn a draft, and assured him of the shipment of the cattle, in accordance with the standing arrangement. The check was then certified, and afterwards paid to the holder. Phelps had, otherwise, no funds in the bank to draw upon. The witness further testified that there were numerous similar transactions with the same parties, all done under the same agreement.

The interpleader Phelps was a witness in his own behalf, and when asked on cross-examination about the conversation described by Mr. Hood, and as to each particular item of the understanding so testified to, gave an apparently hesitating assent that there was some conversation of the sort, but he could not recollect exactly what it was. He admitted that, when he drew his check on the bank in payment for cattle purchased, he had no funds there to meet it, but dealt with the bank under the arrangement, whatever it was, that had been talked over between himself and Hood and Stewart. There were several such transactions, including the one here in controversy. In each instance, as in this, a draft was drawn and paid on a specific shipment of cattle. There was other testimony to the same general effect while, on the part of Phelps & Price, there was testimony tending to show that these dealers made the purchases on their own account, being aided therein by Stewart, for the benefit of his firm, as cattle brokers, and that the transactions with the bank were founded upon the personal credit, alone, of Hamer, Stewart & Burnside. As already intimated, the testimony in support of the first hypothesis appears to us to be more satisfactory.

The appearance in this case of the draft, and of the checks used, raises no question upon the law of commercial paper. They simply indicate the methods employed in consummating the whole agreement, by which the rights of the parties must be here determined. We do not perceive that the law concerning liens has much, if any thing, to do with the present inquiry. Counsel argue with much learning and elaboration that the bank did not properly fortify itself with a lien upon the cattle, or their proceeds, for payment of the draft. But here is no case of an effort by outside creditors or claimants to seize upon property proceeds by virtue of legal process, against which noth short of a pre-existing lien might prevail. So far from

this, the contest here concerns only a claim made by parties who have solemnly promised not to claim, and who have received a full consideration for their promise. The amount, $3,400, received by Phelps & Price, out of the sale money, represented a clear profit upon the transaction, and this profit was made possible to them by the bank's advance upon the draft. It is useless to assert that the bank's rights were in any way modified by an existing indebtedness from Hamer, Stewart & Burnside to Phelps & Price. The latter's agreement and transaction with the bank implied a waiver of such indebtedness, if any there was, as to this particular fund. There could not be a more satisfactory case of estoppel, as against any attempt on the part of Phelps & Price to deprive the bank of the fruits of its money advanced. Counsel for the appellants present a good many points, fortified by numerous authorities, intended to show that there was no equitable assignment to the bank by Hamer, Stewart & Burnside, and no lien created by them to secure payment of the draft, as against Phelps & Price, who were not only the consignors, but also general creditors of the failing consignees. The argument and the cases cited might be appropriate, if Phelps & Price stood in no other relation as parties, than that of creditors of the delinquent firm. But counsel show us no case in which a party, having been enabled to purchase property with money advanced by another upon an agreement for repayment, from a sale of the property, was permitted to assume the position of a stranger to the agreement, to lay a claim in violation of its provisions, and to assume that there was only a race of diligence between equally unfettered and innocent creditors. The authorities relied upon have not the least application to the facts of this case, as we understand them to be shown by the testimony, and to have formed the basis of the judgment below. All the judges concur in affirming the judgment.